

# Missouri Court of Appeals
## Southern District

### In Division

STATE OF MISSOURI, )
)
    Plaintiff-Respondent, )
)
vs. ) No. SD37196
)
WILLIAM HENRY III, ) **Filed: May 14, 2024**
)
    Defendant-Appellant. )

APPEAL FROM THE CIRCUIT COURT OF PEMISCOT COUNTY

The Honorable W. Edward Reeves, Judge

**<u>AFFIRMED</u>**

William Henry III[1] ("Henry") appeals the trial court's judgment convicting him of three

counts of the class A felony of assault of a corrections officer in the first degree under section

565.081.1 (Counts I, III, and V) and three counts of the unclassified felony of armed criminal

---

[1] Henry is referenced throughout the record on appeal as William Applewhite, William Henry Applewhite, William Henry (Applewhite), or William Henry Applewhite aka William Applewhite. Henry stated in open court that Applewhite is not his legal surname. The judgment, notice of appeal, and appellate briefs all refer to Henry as William Henry III. The amended felony information lists Henry as William Henry III, aka William Applewhite.

1

action under section 571.015 (Counts II, IV, and VI) following a jury trial.[2]  The trial court sentenced Henry as a prior offender to 30 years' imprisonment on each count of felony assault of a corrections officer and three years' imprisonment on each count of armed criminal action, with each sentence to run consecutively to each other, for a total of 99 years' imprisonment.[3]  Henry raises two points on appeal alleging the trial court erred by:  (1) admitting video evidence showing a fellow inmate having a convulsive seizure, after being struck by a Taser, when Henry was not charged with assaulting the inmate and "there was no evidence Tasers caused seizures, generally, or caused [fellow inmate's] convulsive seizure, specifically" in that it had no logical or legal relevance to proving Henry committed first-degree assault or armed criminal action against the correction officers, and (2) overruling Henry's motion to dismiss and entering judgment convicting him because the delay of more than 70 months in bringing him to trial was presumptively prejudicial and violated his constitutional right to a speedy trial.

Finding no merit to either point, we affirm the trial court's judgment.

**Factual Background and Procedural History**

On May 9, 2015, Henry was an inmate at the Scott County jail.[4]  At approximately 6:40 p.m., Henry began kicking the door to E pod, where his cell was located, because he wanted the

---

[2] All statutory references are to RSMo 2016, unless otherwise indicated, including all applicable revisions effective January 1, 2017.  Section 565.081 was repealed, effective January 1, 2017.  All rule references are to Missouri Court Rules (2024), unless otherwise indicated.

[3] Henry was charged as a prior offender by an Information In Lieu of Indictment filed September 11, 2017, and a subsequent Amended Felony Information – Prior Offender filed January 10, 2020.  The trial court found Henry to be a prior offender on April 29, 2021.  Section 558.016 was amended, effective January 1, 2017.

[4]  Henry was incarcerated on a charge of murder in the first degree and five other charges, and was awaiting trial.  In his appellate brief, Henry asked this Court to take judicial notice of the underlying charge of murder in the first degree in Butler County (cause number 15BT-CR00680), for which Henry

2

television station changed.[5]  Henry's kicking of the door triggered an alarm in the correction officers' control room, which sounds if the locking mechanism of a jail door is compromised. The correction officers were in the process of changing shifts at that time and requested that Henry wait until the shift change occurred.  Correction officer Amy Johnson, the shift supervisor, asked Henry to stop kicking the door.  Henry refused to comply and used profanity. Officer Johnson again instructed Henry to stop kicking the door or warned he would be placed in "lock down."[6]  Henry again refused.  Officer Johnson instructed Henry to "lock down."  Henry stated he wanted to speak to Officer Johnson.  The entire interaction between Officer Johnson and Henry was over the facility's intercom system.  Officer Johnson proceeded to enter E pod to "lock down" Henry.

When Officer Johnson entered E pod, Henry was "excessively belligerent."  The pod was "hectic," "tension was high," and the inmates in E pod were "pretty angry."  Officer Johnson walked Henry to his cell.  Officer Johnson then tried to remove a book holding Henry's cell door open.  When she tried to remove the book,  Henry "barged" Officer Johnson "back out" of the cell; he was aggressive, belligerent, cursing, and yelling.  Henry cornered Officer Johnson with approximately six inmates around her.  Henry continued to approach Officer Johnson and would

---

was held in the Scott County jail at the time of the offenses charged in this cause, because the charge remained pending and had not yet been tried.  The charge was amended to murder in the second degree, and it and the other five charges were disposed of by judgment dated August 10, 2023, following a guilty plea entered by Henry.

[5] The Scott County jail was described as a pentagon shape, with the correctional officers' control room in the center with a hall around it leading to "pods" that housed the inmates.  The pods were designated A through G.

[6] "Lock down" was described as an inmate going to their cell and securing the cell door.

not allow her to back away from him. Officer Johnson drew her Taser;[7] she instructed Henry not to approach her or she would deploy it. Officer Johnson continued to ask Henry "to stop and just go lockdown." Henry refused.

Officer Johnson aimed her Taser at Henry. Henry lunged at her, grabbed her hands, and struggled for the Taser. The struggle activated the Taser which struck another inmate in the arm but did not hit Henry. Henry forced Officer Johnson into a cell and placed her in a choke hold. Henry told Officer Johnson, "B-, I'm going to kill you." Officer Johnson found it hard to breathe, lost consciousness, and ended up on the floor.

Correction Officers Chase Nelson and Glen Becker went to assist Officer Johnson in E pod. Officer Nelson had a Taser, but Officer Becker did not and was unarmed. When Officer Johnson was cornered, Officer Nelson attempted to Taser Henry but was unsuccessful, and the prongs struck Henry's jumpsuit instead of his body. Officer Nelson then attempted to "drive stun"[8] Henry. Henry shoved Officer Johnson, lunged toward Officer Nelson, and grabbed Officer Nelson's Taser. Henry used Officer Nelson's Taser to repeatedly drive stun all three correction officers.

Officer Nelson then sprayed Henry with OC spray.[9] Henry continued to stun everyone who came close to him. At one point, Henry stunned another inmate. Henry placed Officer

---

[7] A Taser is an electronic weapon designed to incapacitate a suspect once deployed. A Taser deploys two prongs, both of which are required to hit the targeted suspect in order to activate an electrical current. There was expert testimony that a Taser can cause death or serious physical injury if used by someone not trained in its use.

[8] "Drive stun" was described as administering an electrical current by direct contact of the Taser to skin, as opposed to the prongs which can be deployed at a distance. Once the prongs are deployed, drive stun is the only method available to use a Taser.

[9] OC spray is commonly known as pepper spray or mace.

Johnson in a choke hold a second time and "jammed" the Taser into the back of her head. Officer Johnson "went down," hit her head, and lost consciousness a second time. The officers then attempted to exit the pod. Henry blocked the officers from exiting and continued to drive stun with the Taser. The officers were eventually able to exit the pod to safety.

Ron Meredith, chief deputy with the Scott County Sheriff's Office and an expert on Tasers, testified at trial that a Taser should not be used in the head or neck area; that a Taser should only be used in the head area if one is justified to use deadly force. Chief Deputy Meredith testified that a Taser in an untrained suspect's hands is a deadly weapon that can cause serious injury or death.

The incident between Henry and the officers was videotaped on each of the Tasers and on the Scott County Jail's security system. Prior to trial, Henry filed a motion in limine seeking to redact the footage showing his use of the Taser on his fellow inmate and the inmate's seizure. He argued that he was not charged with assaulting an inmate and the evidence of the assault constituted improper evidence of uncharged misconduct, and asked for the video to be redacted to exclude where the inmate has a seizure after the corrections officers left E pod. The State argued the footage provided a complete and coherent picture of the crime and it was relevant to show the effect of the Taser on a person and that a Taser was a dangerous instrument. The trial court overruled Henry's motion in limine.

At trial, the State admitted into evidence State's Exhibits 4 and 5 (two videos from Officer Nelson's Taser), State's Exhibit 6 (video from Officer Johnson's Taser), and State's Exhibits 7 and 8 (videos from overhead cameras in E pod). Exhibits 7 and 8 contain the videos of Henry aiming a Taser toward the fellow inmate who collapsed under the stairs and convulsed

while Henry continued to attack the correction officers with the Taser.[10]  The videos show that after the officers left E pod, Henry went to his cell and other inmates assisted the fellow inmate having the seizure.  Henry objected to the admission of Exhibit 8 as evidence of an uncharged prior bad act and as irrelevant.  The trial court overruled his objection.

## Analysis

## Point I

In his first point, Henry claims the trial court erred when it overruled his objection and admitted "video evidence"[11] showing a fellow inmate having a convulsive seizure because he was not charged with assaulting the inmate and "where there was no evidence Tasers caused seizures, generally, or caused [the inmate's] convulsive seizure, specifically," and it had "no logical or legal relevance to proving [Henry] committed either first-degree assault or armed

---

[10] During the pretrial conference, defense counsel conceded the fellow inmate in Exhibit 8 was Tased at some point during the incident.

[11] Henry's point on appeal is directed generally to video evidence of a fellow inmate suffering a convulsive seizure.  Both Exhibit 7 and Exhibit 8 contain evidence of the fellow inmate's seizure, although Exhibit 8 is a closer and clearer recording.  Henry did not object to the admission of Exhibit 7 at trial and, in fact, stated that the defense had no objection to its admission.  Henry objected to Exhibit 8 at trial.  In his motion for new trial, Henry assigns error to the denial of his motion in limine and objection at trial "to that portion of the surveillance video of E-Pod that included the depiction of an inmate . . . having an epileptic seizure."  The motion in limine sought to exclude a video; counsel argued to exclude video evidence of "one of the overhead cameras in the pod."  If a defendant not only fails to object to the admission of evidence but also states "no objection," then a "defendant affirmatively waives any error in its admission, plain or otherwise."  **State v. Taylor**, 636 S.W.3d 630, 635 (Mo. App. S.D. 2021) (quoting **State v. Hughes**, 563 S.W.3d 119, 125 (Mo. banc 2018)).  Henry's point on appeal assigns error to the trial court "overruling [Henry's] objection and admitting video evidence."  Based on this assertion of error in his point relied on, his failure to specifically object to Exhibit 7, and his explicit statement that he had no objection to Exhibit 7, this Court will treat Henry's point on appeal as directed toward the video of fellow inmate's seizure contained in Exhibit 8.

6

criminal action against those correction officers." Henry further claims Exhibit 8 was evidence of uncharged prior misconduct "admitted to show [Henry's] propensity for violence and admitted without any available exception to the general ban on propensity evidence."[12] We disagree.

*Standard of Review*

Admission of evidence by the trial court is reviewed by this Court for abuse of discretion. *State v. Brown*, 661 S.W.3d 27, 38 (Mo. App. S.D. 2023). A trial court's discretionary rulings are presumed correct and the burden of overcoming the presumption is on the defendant. *Id.* Regardless, "[e]rrors in admitting evidence require reversal only when prejudicial to the point that they are outcome-determinative." *State v. Johnson*, 207 S.W.3d 24, 42 (Mo. banc 2006). Outcome-determinative prejudice is a judicial finding that but for the erroneously admitted evidence, there is a reasonable probability the jury would have acquitted the defendant. *Id.*; *State v. Barriner*, 34 S.W.3d 139, 150 (Mo. banc 2000). This Court reviews the trial court's evidentiary ruling for outcome-determinative prejudice, not mere error. *State v. Yung*, 246 S.W.3d 547, 555 (Mo. App. S.D. 2008).

---

[12] Henry's point on appeal asserts admission of the video evidence was erroneous for various and multiple reasons. He asserts admission of the video was error in that he was not charged with assaulting the inmate; there was no evidence Tasers cause convulsive seizures; the evidence was not logically or legally relevant; and the video was inadmissible as uncharged prior misconduct. A point relied on that contains multiple claims of error is multifarious in violation of Rule 84.04(d), applicable to appellate briefs in criminal appeals by Rule 30.06(c). *State v. Dodd*, 637 S.W.3d 659, 666 (Mo. App. W.D. 2021). "Generally, multifarious points [on appeal] preserve nothing for appellate review . . . ." *Id.* (quoting *State v. Leonard*, 490 S.W.3d 730, 736 (Mo. App. W.D. 2016)). This Court prefers to decide cases on the merits and may gratuitously exercise its discretion to review a defective point on appeal if the appellant's argument is readily understandable. *State v. Putfark*, 651 S.W.3d 869, 879-80 (Mo. App. W.D. 2022) (exercising discretion to review a multifarious point on appeal); *State v. McKenzie*, 599 S.W.3d 269, 272 n.2 (Mo. App. S.D. 2020) (finding appellant's point multifarious, but reviewed points on appeal, in part, *ex gratia*). We choose to exercise our discretion here.

*The Trial Court did not Abuse its Discretion by Admitting Exhibit 8*

Henry argues the trial court should not have admitted the video evidence of his fellow inmate's convulsive seizure contained in Exhibit 8 at trial. He argues the State should have redacted the video to exclude footage of the inmate having a seizure after the corrections officers exited E pod because it constituted improper evidence of uncharged misconduct.

> Generally, evidence of uncharged crimes, wrongs, or acts is inadmissible for the purpose of showing the defendant's propensity to commit such crimes. [*State v.*] *Morrow*, 968 S.W.2d [100,] 107 [(Mo. banc 1998)]. Although evidence of prior misconduct is inadmissible to show propensity, it is admissible if it is logically relevant, in that it has some legitimate tendency to establish directly the accused's guilt of the charges for which he is on trial, and legally relevant, in that its probative value outweighs its prejudicial effect. *State v. Bernard*, 849 S.W.2d 10, 13 (Mo. banc 1993). An exception[] to the general rule that evidence of uncharged misconduct is inadmissible "is recognized for evidence of uncharged crimes that are part of the circumstances or the sequence of events surrounding the offense charged." *Morrow*, 968 S.W.2d at 107. Evidence of uncharged crimes is admissible "to present the jury a complete and coherent picture of the charged crimes . . . ." *Id.*

**Johnson**, 207 S.W.3d at 42 (footnote omitted).

The State contends the video evidence was admissible to show a complete and coherent picture of the charged crimes and to demonstrate that the Taser was a dangerous instrument as required by section 556.061(20).[13]

While Henry correctly points out that the trial court acknowledged the admissibility of the video evidence in its entirety was a "close call," this Court need not decide whether admission of the challenged video evidence was erroneous in that Henry fails to demonstrate the

---

[13] RSMo Cum. Supp. 2020. Henry's trial was held April 29, 2021. At the time of the charged offenses the definition of "dangerous instrument" was provided in section 556.061(9), RSMo 2016. Section 556.061 was amended, effective January 1, 2017, and "dangerous instrument" is now defined in section 556.061(20). The definition itself did not change: "any instrument, article or substance, which, under the circumstances in which it is used, is readily capable of causing death or other serious physical injury[.]"

8

videos' admission amounted to outcome-determinative prejudice as required by our standard of review. **State v. Savick**, 347 S.W.3d 147, 154 (Mo. App. S.D. 2011). As this Court stated in **Yung**, "[a]ssuming *arguendo* that admission of this testimony was error, [Henry] still would not be entitled to have his conviction overturned." 246 S.W.3d at 555.

Here, evidence of Henry's guilt as to the charged offenses was overwhelming. The actions constituting the charged offenses were recorded on videotape and admitted into evidence at trial in Exhibit 7 without objection. Officers Johnson, Nelson, and Becker testified as to Henry's assaults upon them. Deputy Meredith gave expert testimony that a Taser can penetrate a target and cause serious physical injury or death when not used properly, particularly when used as Henry was using it. He also testified that Tasers should not be used on the head or neck because of the possibility of damage and that Tasering someone in the head or face can cause blindness and Tasering someone in the neck can crush the throat and cause death. This Court cannot find that Henry demonstrated that admission of the video evidence was outcome determinative, the prejudice required in order for this Court to grant his point on appeal. Point I is denied.

<u>Point II</u>

In his second point, Henry claims the trial court erred in overruling his motion to dismiss and entering judgment and sentence against him for the charged offenses because his right to a speedy trial was violated in that he was incarcerated for more than five years before his case when to trial. Henry argues the length of delay from the filing of the indictment to trial was "presumptively prejudicial; the reasons for the delay do not weigh heavily against [him]; [Henry] forcefully asserted his speedy trial right; and this delay was grossly prejudicial . . . [and] oppressive *per se* . . . ." We disagree.

Henry was initially charged by indictment on June 22, 2015. On December 28, 2020, five and a half years after the initial indictment was filed against him, Henry filed a motion to dismiss the charges against him on the basis that the trial court had denied him his constitutional right to a speedy trial. Prior to this date, Henry never asserted his right to a speedy trial. A lengthy hearing was held regarding Henry's motion to dismiss. The trial court took the motion under advisement and, thereafter, issued an order denying Henry's motion to dismiss. The trial court noted Henry had not asserted his right to a speedy trial prior to the motion to dismiss and stated:

> 6. The Court notes further that the defendant concedes that "the record does not indicate whether [defendant] asserted his right to a speedy trial." (Motion to Dismiss p.10) This Court's review of the record in this case shows that prior to filing the instant Motion to Dismiss, he did not. To the contrary, with regard to each occasion prior to that on which this Court removed the case from the November 9, 2020, setting, defendant either agreed to or himself requested the removal of the case from a trial setting.

The trial court found Henry had not been denied his right to a speedy trial after considering all relevant factors as required by ***Barker v. Wingo***, 407 U.S. 514, 530 (1972) (setting forth four factors to consider when determining if a defendant has been denied his constitutional right to a speedy trial).

Once Henry raised the issue of his constitutional right to a speedy trial in his motion to dismiss on December 28, 2020, the trial court, on January 5, 2021, immediately set a trial date of July 15 and 16, 2021. On February 5, 2021, the trial court moved this trial date up to April 30, 2021. Trial was ultimately held April 29 and 30, 2021, approximately four months after Henry asserted his right. Henry reiterated his claim that he had been denied his constitutional right to a speedy trial in his motion for new trial.

*Standard of Review*

"When we review a trial court's denial of a defendant's motion to dismiss based on defendant's right to a speedy trial, we defer to the trial court's factual findings and credibility determinations, and review legal issues de novo." ***State v. Hines***, 648 S.W.3d 822, 832 (Mo. App. S.D. 2022).

*Henry's Right to Speedy Trial was not Violated*

> The right to a speedy trial is provided by the Sixth Amendment of the United States Constitution and article I, section 18(a) of the Missouri Constitution. [*State v.*] *Sisco*, 458 S.W.3d [304,] 313 [(Mo. banc 2015)]; *see also* U.S. Const. amend. VI; Mo. Const. art. I, sec. 18(a). The United States and Missouri Constitutions "provide equivalent protection for a defendant's right to a speedy trial." *Sisco*, 458 S.W.3d at 313 (quoting *State v. Taylor*, 298 S.W.3d 482, 504 (Mo. banc 2009)). To assess whether the constitutional right to a speedy trial has been respected or denied, we must balance four factors: (1) the length of delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) the prejudice to the defendant resulting from the delay. *Id.* (citing *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972); *State ex rel. Garcia v. Goldman*, 316 S.W.3d 907, 911 (Mo. banc 2010)). "The existence of any one of these factors is neither necessary nor sufficient to finding a deprivation of the right to a speedy trial." *Id.* (citing *Barker*, 407 U.S. at 533, 92 S.Ct. 2182).

***State v. Estes***, 659 S.W.3d 655, 660 (Mo. App. S.D. 2023). This analysis, or balancing act, is referred to as the ***Barker***[14] analysis.

The first factor, length of delay, is a "triggering mechanism" that must be met before a "presumptively prejudicial" delay is found and other factors then considered. ***Garcia***, 316 S.W.3d at 911.

*Factor One: Length of Delay*

The delay in bringing a defendant to trial is measured from the time a formal indictment or information is filed or when actual restraints are imposed by an arrest. ***Sisco***, 458 S.W.3d at

---

[14] ***Barker v. Wingo***, 407 U.S. 514, 530 (1972).

313.[15]  Delays attributable to a defendant's requests for continuances, motions, or other actions must be subtracted from the length of the total delay.  *State v. Newman*, 256 S.W.3d 210, 214 (Mo. App. W.D. 2008).  Missouri courts have repeatedly held that a delay of more than eight months is "presumptively prejudicial."  *Estes*, 659 S.W.3d at 661; *State ex rel. McKee v. Riley*, 240 S.W.3d 720, 729 (Mo. banc 2007); *State v. Summers*, 653 S.W.3d 155, 163 (Mo. App. W.D. 2022).  Both the United States Supreme Court and Missouri courts have recognized the term "presumptively prejudicial" as applied to the first prong of the *Barker* analysis does not indicate the existence of prejudice under the fourth prong.  *Doggett v. United States*, 505 U.S. 647, 652 n.1 (1992); *State v. Atchison*, 258 S.W.3d 914, 919 (Mo. App. S.D. 2008).

The delay between filing charges against Henry and trial was approximately five years and ten months, or 70 months.  As agreed upon by the State in its Respondent's Brief, the period of delay in this case exceeds the presumptive mark set by the Missouri Supreme Court and triggers analysis of the remaining *Barker* factors.  *Garcia*, 316 S.W.3d at 911.

*Factor Two:  Reason for Delay*

The reasons for delay are assigned different weight in a speedy-trial analysis.  *State v. Heidbrink*, 670 S.W.3d 114, 128 (Mo. App. E.D. 2023).  A deliberate attempt to delay trial or hamper the defense is weighed heavily against the State.  *Id.*  Delays due to negligence or overcrowded court dockets are also weighed against the State, but less heavily than deliberate delays.  *Id.*  A valid reason for delay, such as a missing witness, justifies appropriate delay.  *Id.*  Delays caused by joint continuance requests are considered neutral to the weighing analysis.  *State v. Vickers*, 560 S.W.3d 3, 17 (Mo. App. W.D. 2018).  Likewise, delays due to the COVID-

---

[15] Henry was incarcerated at the time of the offense.  The length of delay is calculated from the time the indictment was filed.

19 pandemic are not weighed against either party. ***Summers***, 653 S.W.3d at 164; ***Heidbrink***, 670 S.W.3d at 129; ***Estes***, 659 S.W.3d at 661 n.3; ***State v. Oliver***, 655 S.W.3d 407, 417-18 (Mo. App. E.D. 2022).

> "Although 'even in a pandemic, the [c]onstitution cannot be put away and forgotten[,]' an overwhelming majority of courts have concluded good cause existed to excuse delays resulting from the COVID-19 pandemic." *State v. Correa*, KNL-CR180135304-T, 2022 WL 2132913, *2 (Conn. Super. Ct. June 14, 2022) (quoting *Roman Catholic Diocese of Brooklyn v. Cuomo*, --- U.S. ----, 141 S.Ct. 63, 68, 208 L.Ed.2d 206 (2020)) (collecting cases). And, because pandemic-related delay is beyond government control, other jurisdictions expressly hold that delay due to COVID-19 does not weigh against the state in a speedy trial analysis.

***Summers***, 653 S.W.3d at 164. Delays due to the COVID-19 pandemic do not demonstrate a "deliberate attempt to delay the trial in order to hamper the defense" or "negligence or overcrowded courts," therefore, these delays are neutral and not weighed against either party. ***Id.*** (quoting ***Barker***, 407 U.S. at 531). Delays attributable to a defendant weigh heavily against such defendant. ***Heidbrink***, 670 S.W.3d at 128. "[A] defendant who contributes to the delay cannot later successfully allege the denial of [his or] her rights to a speedy trial." ***Id.***

The record reflects numerous reasons for the delay in Henry's trial date. Hearings, case status reviews, and trial dates were repeatedly continued in this case at the request of both Henry and the State. Numerous continuances were made by the trial court without a stated reason. To the extent these delays are due to the trial court's docket, they "should be weighted less heavily [against the state than deliberate delays to hamper the defense] but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant." ***McKee***, 240 S.W.3d at 730 (quoting ***Barker***, 407 U.S. at 531). Approximately six continuances were requested by agreement of the State and Henry. Three additional continuances were due to the COVID-19 pandemic. The State requested two continuances in 2019, causing a delay of approximately five months. Henry

requested four continuances, two of which were filed in 2020, each just days before trial was set to begin. The State objected to both motions. Henry also filed two motions for continuances in 2016. Henry further contributed to the delay by seeking a change of judge and a change of venue. Henry's requests delayed his trial by approximately 10 months. These delays weigh heavily against Henry. **Heidbrink**, 670 S.W.3d at 128.

The trial court found Henry contributed heavily to the reasons for delay.

> 8.      The second factor identified in Barker is the reason for the delay. Here, the defendant himself has requested or agreed to the delay on each occasion this case has been removed from a trial setting with the sole exception of the most recent continuance, when the Court was in Phase One of the COVID-19 Operational Directives of our Supreme Court. The two most recent requests for continuances prior to that action by the Court on it's [sic] own Motion were filed by defendant and the stated reason for both was that defendant had retained new counsel. On those occasions, also, the State objected to the request based upon the age of the case. In light of this procedural history, this Court will not, as suggested by defendant "attribute this failure to bring [defendant] to trial quickly against the State." (Motion to Dismiss p.9).

This Court agrees with the trial court and determines Henry contributed more so to the delay in trial than delays caused by the State or for neutral or justified reasons, such as agreement of the parties or COVID-19. Factor two weighs against Henry.

*Factor Three:  Assertion of Right*

Timely assertion of the right to a speedy trial by a defendant is a factor in determining whether his or her right to a speedy trial has been violated. **Hollings v. State**, 662 S.W.3d 821, 833 (Mo. App. E.D. 2023); **Estes**, 659 S.W.3d at 661; **Heidbrink**, 670 S.W.3d at 129. "[F]ailure to assert the right will make it difficult for a defendant to prove that he was denied a speedy trial." **Hollings**, 662 S.W.3d at 833 (quoting **Barker**, 407 U.S. at 532).

Regarding this factor, the trial court found:

> 9.      The third factor identified in Barker is the defendant's assertion of his or her right to a Speedy Trial. Defendant characterizes this as an inquiry into

14

the "timeliness of the assertion and the frequency and force of a defendant's objection to delay in trial." (Motion to Dismiss p.9). Here, as noted above, defendant concedes that prior to filing the instant Motion to Dismiss the record does not show that the defendant ever formally invoked or asserted this right, either while this matter was pending in the Circuit Court of Scott County or before this Court. Neither, however, did defendant affirmatively waive his rights in this regard. While the Court is not permitted under Barker to presume a waiver from mere silence on defendant's part, 407 U.S. at 24, the record in this case is replete with instances on which defendant either requested or agreed to the delay that he now argues requires it's [sic] dismissal.

Henry did not assert his right to a speedy trial until he filed a motion to dismiss the charges against him on December 28, 2020, five and a half years after the initial indictment was filed against him. At the time he filed the motion to dismiss, he had never asserted his right to speedy trial. "[W]hen the defendant asserts his right later in the proceeding through a motion to dismiss rather than a motion for an immediate trial, his actions will be read to indicat[e] a desire to avoid trial rather than to have a speedy trial." *State v. Smith*, 389 S.W.3d 194, 213 (Mo. App. S.D. 2012) (quoting *State v. Scott*, 348 S.W.3d 788, 797 (Mo. App. S.D. 2011)), *abrogated on other grounds by State v. Sisco*, 458 S.W.3d 304 (Mo. banc 2015)) (internal quotations omitted). This weighs heavily against Henry. *See Smith*, 389 S.W.3d at 213; *Atchison*, 258 S.W.3d at 920.

Once Henry raised the issue of his constitutional right to a speedy trial in his motion to dismiss on December 28, 2020, the trial court, on January 5, 2021, immediately set a trial date of July 15 and 16, 2021. On February 5, 2021, the trial court moved this trial date up to April 30, 2021. Trial was ultimately held April 29 and 30, 2021, approximately four months after Henry asserted his right.

Factor three weighs heavily against Henry and in favor of the State.

15

*Factor Four:  Prejudice*

Factors to consider in determining whether a delay prejudiced a defendant are (1) prevention of oppressive pretrial incarceration; (2) minimization of anxiety and concern of the defendant;[16] and (3) limitation on possible impairment of the defense (the most serious concern). ***Sisco***, 458 S.W.3d at 317.

The trial court found Henry was not prejudiced by the delay between his indictment and trial.

> 11.     Defendant through counsel disclaims any willingness to "speculate" as to whether defendant has been prejudiced by the delay in this matter in the sense that it has "weighed heavily on him" or that "he suffered from a specific instance of anxiety and concern." (Motion to Dismiss p. 11). Having been detained for this prolonged period of time, of course would not be a pleasant experience for any person, and the Court is not unsympathetic to the defendant's position. Here, though, the defendant is also held in pre-trial detention by reason of the original murder charge for which he was confined at the Scott County jail at the time of the commission of the offense alleged in this case. As noted above, defendant throughout the pendency of both cases has been financially unable to meet the monetary conditions of the bond set in the older of the cases, now pending in Butler County Circuit Court. Dismissal of this case, in other words, would not result in the alleviation of the defendant's conditions associated with pre-trial confinement.

> 12.     The final consideration in this regard is that the defense of the accused may be impaired by the passage of time. Of course, it is true that memories fade, and witnesses may become unavailable through death or illness, over time. The offense in this case charged by the State, however, occurred in a jail facility, and the events at issue were recorded by both video and audio equipment. The alleged assaults took place over a span of only several minutes. Therefore, the Court concludes no prejudice is caused to any defense that may be asserted by defendant by the passage of time to date.

---

[16] Henry's briefing does not address the second factor of prejudice, anxiety and concern.  Every criminal defendant undoubtedly experiences anxiety and concern.  ***Newman***, 256 S.W.3d at 217.  "That alone, however, does not establish prejudice where, as here, the defendant *neither asserts nor shows that the delay weighed particularly heavy on him . . . .*"  ***Id.*** (emphasis added).

At the time Henry was awaiting trial on the charges in the underlying case, Henry was incarcerated at the Scott County jail awaiting trial for other crimes out of Butler County, including a charge of murder in the first degree. Henry ultimately pled guilty in that case to murder in the second degree, two counts of armed criminal action, assault in the third degree, possession of a firearm, and unlawful use of a weapon. He was sentenced to a term of twelve years' imprisonment.[17] On the charges and conviction now before this Court, Henry was sentenced to 99 years' imprisonment. Henry's sentences greatly exceed the length of his pretrial incarceration. *See Smith*, 389 S.W.3d at 214.

Henry argues that the constitutional right to a speedy-trial analysis requires a finding of prejudice here in that he *could have* been prejudiced. Henry argues:

> [W]hat happens when the prosecutor enters a *nolle prosequi* dismissing the earlier charge a month later? Worse yet, what if, after the speedy trial motion was denied in this case because of the extant case, the preexisting case was dismissed a month later for a constitutional speedy trial violation?

However, prejudice resulting from a delay in trial must be actual and apparent from the record or reasonable inference. *Newman*, 256 S.W.3d at 217. "Speculative or possible prejudice is not sufficient." *Id.* (quoting *State v. Weeks*, 982 S.W.2d 825, 836 (Mo. App. S.D. 1998)). Henry's failure to present evidence of actual prejudice weighs heavily against him and in favor of the State. *Id.*

Henry further argues that he was also prejudiced in that he could have received concurrent sentences in the two cases. Henry relies on *Smith v. Hooey*, 393 U.S. 374 (1969).

---

[17] Henry was sentenced to a term of imprisonment for 12 years on the murder in the second-degree charge (Count I). He was also sentenced to terms of imprisonment for three years on each conviction for armed criminal action, 12 years on the assault in the third-degree charge, five years for possession of a firearm, and four years for unlawful use of a weapon (Counts II through VI). The sentences on Counts II through VI were ordered served concurrent with the sentence on Count I.

17

This Court finds **Hooey** inapropos. Unlike the defendant in **Hooey**, Henry did not repeatedly and continually assert his right to a speedy trial. Henry raised the issue of his constitutional right to a speedy trial in a motion to dismiss that was filed five and a half years after the initial indictment was filed. Also, unlike the facts in **Hooey**, the record here demonstrates there was a continual effort by the State to bring Henry to trial. Further, the trial court did not lightly dispense with Henry's claim that his constitutional right to a speedy trial had been violated. It held a hearing and issued findings of fact on the merits of Henry's claim.

Henry also asserts he was prejudiced because he was unable to locate a witness, the fellow inmate shown having a convulsive seizure in Exhibits 7 and 8, until sentencing. Henry argues the inmate testified at sentencing, and would have testified at trial, that Henry's actions did not cause his seizure.

> [The inmate's] testimony was useful: he testified to his history of epileptic seizures, that he was not receiving adequate preventative seizure treatment by government agents while in the Scott County jail, and that [Henry's] actions had nothing to do with [the inmate's] seizure.

Henry was not prejudiced by the omission of the inmate's testimony at trial. There was overwhelming evidence of Henry's guilty of the charged offenses without evidence of the inmate's convulsive seizure; whether or not Henry's actions caused the witness's seizure does not affect this finding. Further, Henry fails to explain why he was unable to locate the inmate prior to trial, but was able to locate him after trial and before sentencing. Henry fails to demonstrate how a delay of six years impaired his ability to locate said witness, yet he was able to locate him thereafter.

Because Henry fails to demonstrate prejudice in the delay between the indictment and trial in his case, this factor weighs in favor of the State.

This Court's review of each of the relevant ***Barker*** factors, and the weight afforded each factor, leads it to conclude Henry's constitutional right to a speedy trial was not violated.[18] Point II is denied.

## Conclusion

Henry's points on appeal are denied. The trial court's judgment convicting him of the class A felonies of assault on a corrections officer in the first degree (Counts I, III, and V) and the unclassified felonies of armed criminal action (Counts II, IV, and VI) is affirmed.

JENNIFER R. GROWCOCK, J. – OPINION AUTHOR

JEFFREY W. BATES, J. – CONCURS

GINGER K. GOOCH, Sp.J. – CONCURS

---

[18] *See **Newman***, 256 S.W.3d at 214, 216, 218 (finding no speedy trial violation in a six-year delay between arrest and trial; the record did not demonstrate that the State or court had deliberately delayed trial to impair the defendant; the defendant did not assert his right to a speedy trial in a motion other than a motion to dismiss).